The next argument is in Siken v. State of New York. First up is Mr. Scola. May it please the court? My name is John Scola. I'm representing appellant Arthur Siken. This is one of the rare cases, the discrimination cases, where a supervisor made her discriminatory intent known and then followed through with her threat to my client. This matter involves four promotional opportunities, which Ms. Sarah McCray, who specifically told appellants that he would not be promoted because he was Jewish, had wielded much influence and control over four promotional opportunities. The reasons set forth by the State of New York are contextual for discrimination as to the reasons why my client was denied these promotional opportunities. Most notably, they cite to his four-day work schedule, which is a compressed work schedule which he was granted on the basis of a religious accommodation in order to disqualify him for multiple promotional opportunities. Further, they claim that his resume that he submitted via fax and by mail was somehow blurry and discredited him from these promotional opportunities. Further, they cite that he possessed no supervisory experience and exaggerated his basically what he did at work in order to deny the promotion. Now subsequently, the deputy commissioner actually helped my client with his resume and stated explicitly that he did have supervisory experience, the same reasons that he was excluded from previous promotional opportunities. Now, the state does submit that my client does not have a good work history and was a poor performer, that he never received a negative evaluation in the 34 years that he was there and received no discipline. One of these promotional opportunities, more specifically 37-2015, was left vacant even though an appellate plaintiff's direct supervisor testified that he was more than qualified for the job and actually would excel in the role. The woman that actually decided to leave that promotional opportunity vacant was the same woman who made the comment to my client that he would not be promoted because he was Jewish. On the other hand, counsel, as you point out, nobody was appointed because it was deemed that nobody was qualified. Right, but whether or not my client was qualified or not, it was a question for a jury to decide considering he had witness testimony from his direct supervisor that he was qualified for that position and he would excel in that role. The person who made the decision ultimately to leave it open was Sarah McRae who specifically told my client that he was not going to be promoted because he was Jewish. So your point that, excuse me, your point I take it is that leaving the doesn't refute discrimination. It just means that the agency chose nobody in preference to Mr. Sikand as opposed to choosing somebody in preference to Mr. Sikand. But if he was, if absent discrimination, maybe it wouldn't have been left open because even if nobody else was good enough to get the job, he was is your argument, right? That's exactly right, your point. On the other hand, your client conceded that a lack of experience working with the specifically used in luxury decontrol, which is what the supervisory job is. I mean, I think as with any role, he could have been easily trained for that position. He did have experience supervising other employees, but the person that actually made the decision for 36 to 15, which is, it was a joint interview for 36 to 15 and 37 to 15. Citano basically disqualified my client for saying that he had a poor work performance, but Citano supervised him from 1994 till 2013 and gave him nothing but stellar performance evaluations. The reason stated by the state of pretext, and I mean, my client's direct supervisor, Mr. Adams testified that Mr. Sikand was qualified for that position and whether or not he was, it's a question of fact that needs to be determined by a jury and it's not a matter of summary judgment. Did your client have any documented supervisory responsibility? I mean, I do understand that until you get some supervisory responsibility, you won't be able to discharge it. So it's a chicken and egg problem, but is it true that your client did not have supervisory responsibility at the juncture when the vacancy decontrol position was being considered? That is not true, your honor. My client had an older resume, which was in effect for the first two interviews, for 36 to 15 and 37 to 15. However, his role did not change at all between that date and the updated resume, which came in early 2016. The updated resume was basically concocted and drafted by the deputy commissioner, Woody Pascal, the highest ranking member of the organization, and ultimately had the final say on these promotional opportunities, although he never met with any candidates and it was basically rubber stamped from his subordinates. In that resume, which was drafted by the deputy commissioner, it specifically referenced multiple supervisory roles that Mr. Sykes had, including training and hiring staff and delegating duties. His direct supervisor, Tapano, who interviewed him for the 37 to 15 and 36 to 15, accused Mr. Sykes of exaggerating his supervisory role and it's just pretextual. He would have known that Mr. Sykes supervised subordinates, but if the deputy commissioner knew, the reasons set forth by the state, basically overvisionist and pretextual. Not to mention that he was automatically disqualified by having this eight day compressed work week, where he would have off on Fridays and work longer hours Mondays and Thursdays. And Mr. Sykes knew, as he supervised him at the time, it isn't granted that the reason why he had this compressed schedule was based on a religious accommodation. So as a result, the writings of the defendants here, the appellees, are discriminatory on their faith. Okay. Thank you, counsel. We'll hear next from Mr. Heron. Okay. Good morning. Just barely. It's almost the afternoon. Your honors may approve the court. My name is Eric Heron from the New York State Office of the Attorney General for the appellees. Mr. Sykes sought promotion to four supervisory positions for which it is undisputed that hiring personnel sought supervisory experience. The candidate would be responsible for supervisory tasks such as day-to-day management, training, counseling subordinates, and providing feedback to subordinates. Summary judgment on Mr. Sykes' claims regarding each of these positions should be affirmed based on the undisputed record below. For the position in the owner evictions unit, it's undisputed that the agency elevated the person who had already been performing this supervisory role for several years. And it's also undisputed that the only person Mr. Sykes accuses of discriminatory animus, Ms. McCray, didn't know who else for this position. So there is no way that animus against Mr. Sykes could have been a motivating factor for this determination. Next, for the property management bureau position, it's undisputed that all three decision makers, Mr. Totano, Mr. Fuller, and Mr. Pascal have never been... Could you give the number because the property management position, what's the number of the application? Sure. Sure. That number is... That's what I have my notes to organize. Yeah. I'm happy to, Your Honor. For the position I referenced in the owner evictions unit, the number was 38-2015. And for the position in the property management bureau, the number is 36-2015. Got it. Thank you. No, you're welcome. And as I was saying, it's undisputed that all three decision makers for this position, Mr. Totano, Mr. Fuller, and Mr. Pascal have never been accused of religious bias by Mr. Sykes. And that's at page 625 of the record. It's also undisputed that Mr. Totano concluded based on his personal knowledge of Sykes' work in the mediation unit, that Sykes' resume did not accurately represent his supervisory and training experience. Mr. Totano offered detailed unrebutted testimony about his views based on his personal knowledge of Mr. Sykes' performance. Mr. Skola referenced the fact that Mr. Sykes hasn't received unsatisfactory ratings, but being satisfactory in a non-supervisory job doesn't mean a person is qualified to be promoted to a supervisory role and supervise others. It's also undisputed, and this is at page 622 of the record, paragraph 104, that Mr. Sykes did not list a position he held for nearly three years on the resume he submitted for this position, and that the information about his experience in the mediation unit was inaccurate. And I'd urge the court to take a look at that resume at page 589 of the record. You'll see that it shows no articulation of any skills or experience from 1987 forward, other than what Mr. Totano found to be false and outdated. Next, for the luxury decontrol position, it was kept vacant, and this is number 37-2015. It's undisputed that Bureau Chief Lance and Deputy Commissioner Pascal have never been accused of bias by Mr. Sykes. In fact, Mr. Skola noted that a couple of months after these decisions were made, Mr. Pascal helped Sykes fix his resume. It's undisputed that the flowchart, which is the documentation where the decision is recorded, that was signed by Bureau Chief Lance has the same conclusions that Mr. Totano reached based on his personal knowledge of Mr. Sykes' resume and his supervisory experience, and that's at page 544 of the record. So, there's no evidence for this position that there was any unique causal contribution by Ms. McCrae. There is a flowchart signed by Mr. Lance. The reasons recorded therein were supported by Mr. Totano's personal knowledge, and the Deputy Commissioner who instructed that this position remain vacant also has never been accused of religious bias, and it is also undisputed. If I could ask about that, the disadvisor, you know, voicing an anti-Semitic, you know, sentiment, and I can't remember the wording you just used, but how can we say that there's no, you know, that no reasonable jury could find discrimination just in light of that? I think for a couple of reasons in the unique facts of this particular determination, the flowchart prepared by Mr. Totano records the reasons, and there's no dispute that what's recorded there was written by Mr. Totano, and Mr. Totano's declaration offers extensive and unrebutted testimony about how he arrived at those conclusions. The person who signed the flowchart, Mr. Lance, hasn't been accused of religious bias, and the person who directed that the position remain vacant, and it in fact remained vacant for at least two years, if not longer, that's Deputy Commissioner Pascal, also has never been accused of religious bias, and Mr. Sikand hasn't offered any evidence that anything Ms. McRae contributed to this hiring process was the cause or a proximate cause of a promotion denial. There were, I think, four or five different people in those interviews and multiple decision makers above Ms. McRae, and it is Mr. Sikand's burden to demonstrate either that a contribution by Ms. McRae was a but-for cause or at a minimum a motivating factor, and looking at the facts of this particular hiring determination, he hasn't done that. There's nothing in the flowchart that evidently came from Ms. McRae. There is no other evidence that anything she said as opposed to something Mr. Lance contributed or Mr. Totano contributed or the Deputy Commissioner contributed was a motivating factor for the determination to keep this position vacant. It's also, for this particular position, it's undisputed that the two resumes are of Ms. McRae with considerably more supervisory experience than Mr. Sikand, and I point the court there to pages 545 of the record, 593 of the record, and 90 to, I may have the pages wrong for this one, but the two resumes are Ms. Philip and Mr. Thomas, and both of their resumes record decades or at least between one and two decades of supervisory experience, and they were rejected as unqualified to be promoted to this supervisory position, and at the time this determination was made, it's not correct that what Mr. Scola said that Mr. Sikand had several years of supervisory experience that was just not recorded on his resume and that somehow everyone should have known that. What was actually the case, and this is in the record, is that sometime around November 3rd of 2015, he was made Mr. Duggar's second-in-command, and from that period until when he requested a transfer after he and Mr. Duggar had a deteriorating relationship, he had supervisory experience. So that's a period of maybe one month before these interviews took place in early December, and does not support the statements Mr. Scola made about Mr. Sikand's supervisory experience. So the comparison is between, I don't want to say comparison, there were multiple candidates who didn't qualify for this position despite having between one and two or more than two decades of supervisory experience, and Mr. Sikand at the time, although not recorded on his resume, only offered maybe one month of that type of experience. And I just also add that Deputy Commissioner Pascal's declaration, which isn't disputed, says he was well aware of all of the candidates, he had reviewed their resumes, he had formed opinions about the candidates based on his own making the rounds in the agency, and his view was that Mr. Sikand was not with among the weaker candidates, that he had received reports that Mr. Sikand would not take direction, that was not willing to perform his assigned job responsibilities, and that Mr. Sikand had a history of being an uncooperative employee, and there are counseling memoranda that are in the record at pages 385 to 388 that show issues that Mr. Sikand had with two different supervisors at the agency documenting issues of that nature. For the Office of Housing Management position, and this is number 12-2016, it is undisputed that Mr. D'Amico did not harbor religious animus, and that's record page 639. Mr. Sikand has never made an allegation that any of the other interviewers for that position had such animus. It's undisputed that the person who was chosen had decades of supervisory experience, and Mr. Sikand did not. It is undisputed that Ms. Phillip had the preferred schedule, and Mr. Sikand did not, and Mr. Solla brought up the issue of the schedule and claimed that that was an issue that was relevant to all four of the determinations, but that is not the case based on the record. It's undisputed that the only one of these four positions for which the and it is also undisputed at page 637 of the record that Mr. D'Amico didn't know the reason Mr. Sikand had a compressed schedule, so it's not possible that any of those issues was a motivating factor for discrimination here. Let me move on to the question of this remark. Isn't the decision that Mr. D'Amico made the one in which Ms. McRae was consulted as to Mr. Sikand's performance? That's correct, Your Honor. She puts the dagger into him, doesn't she, for that position, and maybe not because of bias or whatever, but wouldn't a jury be permitted to conclude that he was one of the final interviews, his references were being checked, and Ms. McRae, who is the person who the jury could find was biased, gives a very damning account of Mr. Sikand's abilities? It's true that there's no dispute that they spoke, and what Mr. D'Amico's declaration says is that they made the decision to hire Ms. Phillips after completing the remaining interview, and the remaining interview was Mr. Sikand, so Mr. D'Amico's testimony is that that's what the or at least it is undisputed, that as part of his normal process of calling candidates references, Mr. D'Amico reached out to Mr. Sikand's supervisor, and Ms. McRae conveyed information to him that reflected work performance only and information that's corroborated by the Pascal Declaration, counseling memos. I'm sorry, are you saying that the evidence is that that call to Ms. McRae was just pro forma and the decision had already been made not to offer the job to Mr. Sikand? I'm saying that Mr. D'Amico's declaration says that the group decided to hire Ms. Phillips once the remaining interview was completed, and the remaining interview described there based on the dates was Mr. Sikand's. But was that before or after his references were checked? That, I understand, was before. I see. But Mr. D'Amico does say that as part of finalizing his decision, he called the and that, of course, is not disputed. And you're saying that a reasonable jury would have to conclude that if Ms. McRae had told D'Amico when he checked the references that Mr. Sikand was the greatest employee ever, it wouldn't have mattered because it had already been decided that he wasn't going to get the job based on the interview and based on Ms. Phillips? It's clear that from the interviews, Mr. Sikand conveyed a fairly awful impression, and that's putting it mildly. There was a, and this is unroboted testimony from Mr. D'Amico in his declaration, that Mr. Sikand appeared uninterested in the details of the job and asked questions focused about on maintaining his schedule and that even when asked whether he would take the job, if he couldn't keep his shorter schedule, Mr. Sikand, when Mr. Sikand responded that he would only consider taking the job if he could keep his compressed schedule. And those comments are reflected in the contemporaneous documentation, the flow chart that Mr. D'Amico signed. Okay. I understand. Thank you. And let me just add about the remark. I'm sure the court is familiar with the cases that say that a single stray remark even by a decision maker is not enough to survive summary judgment. And that even a weak issue of fact is not enough in the face of abundant, uncontroverted, independent evidence of legitimate non-discriminatory reasons. I don't know that, I understand that the court on a summary judgment case like this will evaluate the whole record and determine whether a rational trial or fact could rule for Mr. Sikand on any of these claims. But I wanted to mention those points. And I wanted to just get to one final point before concluding. I don't want to let pass your reference to your use of the word stray. Right. I mean, there are many cases where somebody makes a remark that an enlightened person might think shows some bias and that gets written off as a stray remark. Is there any case where we called something a stray remark where A, it was expressly a judgment based on somebody's religion or other protected category, B, it was made directly to that person, and C, it was linked to a statement that you will never get promoted if you keep behaving the same way? I mean, it's pretty hard to call that a stray remark, isn't it? I think that that's a fair point. And I can't point the court to any particular case where that is what occurred. And which is why I wanted to get to my final point, which is unrebutted points in the state's brief regarding the inconsistent version of events that Mr. Sykin has offered over the course of his EES2 charge, complaint in this case, interrogatory, the first day of his deposition, and then the second day of his deposition, because there isn't really one version of this that the court could credit. His complaint mentions a sleeping incident and refers only to management. And by sleeping incident, I mean, Mr. Sykin alleges that the remark occurred when he was having a conversation with Ms. McRae about another employee sleeping. And so that's what I mean by sleeping incident. And Mr. Sykin's EES2 charge, supposedly six months after the sleeping incident took place, doesn't mention it at all. His federal complaint mentioned an incident and refers only to management, not McRae, and doesn't refer to any discriminatory remarks by McRae. His sworn interrogatories on September 27th of 2017 mention a sleeping incident and a remark by McRae with no reference to promotional prospects. And here he says he can't remember the date it happened or whether it happened in Ms. McRae's office. And less than six weeks later, on the first day of his deposition, he mentions the sleeping incident and a remark by McRae, again with no reference to promotional prospects. And on the second day of his deposition, the first time any reference to appears, he now says the remark happened in Ms. McRae's office. And the two versions of his testimony, this is at page 174 of the record and 222 of the record, just portray starkly different versions of what is purportedly the same conversation. In one, he describes a conversation with Ms. McRae that begins with a team player comment, has no reference to a promotion, involves a threat of a lawsuit that he made, and his own accusation to Ms. McRae that she had an intent to ruin him. And in the second version of the conversation, he gets called into Ms. McRae's office, despite not remembering in his interrogatories weeks earlier where the conversation happened. And here there is a connection between protecting another employee and being Jewish. And at the end, he asserts McRae said, you are not a team player, and if you are not a team player, you will never get promoted. I just want to highlight that these are just starkly different versions of what is purportedly the same conversation. And under the Rojas case, which I think is important for two reasons, the court can affirm summary judgment here, notwithstanding Mr. Sikand's testimony about the remark. And the two reasons are, one, under Rojas, the court can- Briefly, counsel, you're well over your time, so please wind up quickly. My apologies. One more minute. The two reasons are, one, the court can just discard the last testimony about the remark when he refers to promotional prospects. Or second, just taking it into account in the entire record under the Schnabel case, the court can conclude that he has not presented a genuine issue of fact. Thank you, your honors, for your indulgence. Thank you, counsel. Mr. Scola, you have two minutes of rebuttal. Yeah, I just want to say it doesn't make any sense that someone would interview a candidate, determine that candidate to be horribly, you know, like, they do a determined that there's no way to get this job, then show him around the office, and then call his references, and then who basically calls my client lazy, and then gives the job to somebody else. The actions of Domenico was to give my client the job. And then it was torpedoed by Ms. McCraig, who already made her discriminatory animus known. My client cannot, basically, the opposing counsel concede that my client has supervisory experience prior to the interviews with 36 and 37 of 2015. And further, in promotional opportunity 12, 2016, Domenico specifically cites my client's desire to keep his religious accommodation confessed as a reason for denying my client promotion. Given the remarks by Ms. McCraig, and the qualifications of my client, and the facially discriminatory notes on the flow chart, this is a question of fact that a jury did include that my client was being discriminated against, and that was the true reason for him not being promoted. Thank you, Your Honor. Thank you. We'll take the case under advisement.